STATE OF MAINE *vs.* THOMAS RIST.

Penobscot.     Opinion July 12, 1930.

*Albert G. Averill,* County Attorney, for the State.
*Edward P. Murray,* for respondent.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, JJ.  PHILBROOK, A. R. J.
PATTANGALL, C. J., FARRINGTON, JJ., NON-CONCURRING.

BARNES, J.  After trial before the Superior Court for Penobscot County, in September, 1929, on an indictment charging manslaughter, and after verdict of guilty, respondent moved for a new trial on the usual grounds.

Hearing was had on the motion: it was overruled, and appeal was taken to the Law Court.

No exceptions were taken to the admission of evidence, or to the instructions of the Court.

The greater part of the evidence submitted to the jury is uncontradicted. Lena Young of Bangor was killed when a five-passenger closed car, in which she was riding, came to a stop in a roadside ditch, and fell over on its right side. The accident occurred, on Broadway, about a mile and a half from the Bangor Post Office building, between three and four o'clock on the morning of May 28, 1929.

When the car was righted the head and upper portions of the woman's body were found to have been on the ground, under the right, fore door of the car. Since the door was closed this part of her body must have protruded through the window of the fore door before the car tipped to its side.

Part of her body and her lower limbs were within the car, but she dropped through the window to the ground as the car was lifted, apparently dead. At the Eastern Maine General Hospital, shortly after the occurrence of the accident, she was pronounced dead by a physician who examined her, and who testified that death was caused by internal injuries of the left chest and a fracture at the base of the skull, or by either of such injuries.

The car was owned by the woman. In company with a woman, variously termed, Mrs. Pushard, Miss Pushard and Helen Welch, she met the respondent soon after midnight, on Exchange Street,

in Bangor, where her car was parked, and he drove the woman to a camp, on Pushaw Pond, a distance of seven or eight miles.

Francis Rist, a brother of the respondent, with three or four other men, arrived at the camp very soon after respondent's party; and the testimony is that the two women amused themselves in the music room while the men stayed in the kitchen, until about three o'clock, at which time the brother's party drove away, and the respondent and the two women took the road in the direction of Bangor, respondent again at the wheel. It was past daybreak when the return journey began.

At a point on the Pushaw Pond road, about three and a half miles from the scene of the accident, and about a quarter of a mile from the junction of this road with Broadway, a resident was roused from his bed, as he testified, by "loud talk as though there was an argument going on; a lady was doing most of the talking, and above my house is a rock; the piece of road at that time hadn't been fixed for spring and the cars had to go pretty slow so I got out of my bed and went to the window, the window was up, and looked out through and watched them go by. There was Mr. Rist and the two ladies in the car." He testified that respondent was driving; that it was "all daylight"; there were no lights on the car; and that respondent and both women were in the front seat. It was twenty-five minutes past three, by his clock, when the car passed his house.

When next seen, the car passed the Coffin and Wood houses, on Broadway, about a mile and a half from the city of Bangor.

The road at this point is a cement-surfaced highway, running nearly south; straight, somewhat down grade; with cement surface eighteen feet wide, gravelled margins about two and a half feet wide, and slopes to ditches, that on the east side, below the Wood driveway, termed a deep ditch, and the westerly ditch, a foot or a foot and a half lower than the cement roadway. Southerly from the houses and on the east side stood a mail-box, on a post.

The Wood residence is on the east side of the road. Mrs. Wood testified that she had just been up with the baby, when she heard the "roar of an engine," "heard the car coming and heard it go by the house and immediately heard the crash."

Mr. Coffin and his mother, living nearly opposite the Wood

house, were in their yard, on the south side of their house, quelling a disturbance of their hens by the dog when they heard a roaring noise. Mr. Coffin saw the car as it crossed to the west side of the road and plunged into the ditch.

Mrs. Coffin did not see the car till it was tipped over in the ditch.

She testified, "the noise and the crash of the mail-box being struck was instantaneous ; it was almost right together, you know, — the noise sounded like brakes being applied; that is what it sounded like, and then right on top of that was the crash of the mail-box being knocked over, and the crash of broken glass — it was all in a minute, in an instant."

The house cut off her view of the car as it approached from the north, but she testified she heard the brakes being applied before the car came down where she could see it.

The respondent went to the Coffin house, and Miss Pushard to the house of Mr. Green, said to be five hundred feet north of the car, for help. Mr. Coffin accompanied the respondent to the car, calling Mr. Wood. Mr. Green came and the car was righted, and as Lena Young's body fell into the ditch, Mr. Green made some examination, pronounced the woman dead, and the party awaited the arrival of officers, summoned by telephone, from the Coffin house.

Sergeant Beck and officer Peterson, of the Bangor police, got notice of the accident at 3.40 A.M., and made a quick run out with the ambulance. Captain Holmes and driver McClay followed, and arrived "just shortly after the Sergeant."

Several of the people above enumerated observed and examined what they call the wheel tracks of the car. Mr. Coffin, who saw the car cross the road from the east side, and who assisted in righting it up, followed its tracks back from the pool of blood and the shattered glass of the two right doors, and found on the cement, where the car ran diagonally from the east side westerly, two black tracks, as "where rubber dragged." Following further, the tracks of wheel or wheels of one side of the car ran southerly down the road, on the gravelled east margin of the road, a distance of about fifty feet from the broken post of a mail-box to where it swerved to the west side of the road. On portions of the easterly margin of the road there was grass. Mr. Coffin testified that where the wheels made

tracks in the grass the tracks were black, "where the brake was dragging, dug up the grass."

He testified the mail-box post was broken off, and the body lay some eighteen feet southerly of the stump of the post. Also that on the left side of the car, about under the riding light, the machine showed a "big dent where it hit the mail-box."

From the mail-box stump tracks were followed northerly to a point about opposite the Coffin house, and, as the car ran, about 115 feet from its stopping place in the ditch.

Chief Crowley, of the Bangor police, was notified of the accident at 8.45 in the morning and at once visited the scene.

He testified to the marks on the roadway, called tracks by Mr. Coffin. He made measurements, and had photographs made. The latter were admitted at the trial but not presented to this Court. Mr. Crowley found the "tracks" still plainly visible, termed the dark tracks "brake tracks," and testified to the mark made by the car wheels on gravel and grass on the east side of the road.

He said, on the grass the grass roots were pulled out.

The photographer, Mr. Barry, went to the scene with Mr. Crowley, and his description of the surface of the road is practically the same as the others.

It is the theory of the State that the respondent was driving the car as it passed the Coffin house, and that the course of the car from the Coffin house to its resting place in the ditch, the evidence of the broken mail-box on the east side of the road, and the evidence of brake application, demonstrate that respondent drove the car with such utter disregard of the rights of his companions that he is guilty of manslaughter.

One of the witnesses who assisted respondent in righting the car testified that respondent's breath had the smell of liquor. Two testified that while awaiting the arrival of the officers whom he had summoned, and after hearing Mr. Green say the woman was dead, respondent cried out that they should get a rope and hang him before the cops arrived, and that he said he had killed Lena. The nurse who received the body at the hospital testified that he there said he had killed Lena, and, "I should have a rope put about my neck. That is what I deserve."

The other woman occupant of the car did not testify.

The respondent took the witness stand and testified that at the time of the accident, and for some miles of the course before the accident, the Young woman drove the car. He told the jury that he drove down the Pushaw Pond road to its junction with Broadway, and turned north, away from Bangor, and continued northerly for "maybe half a mile"; that the Pushard woman was in the back seat; that after driving northerly on Broadway for a half mile, he stopped, turned the car, and drove a little way southerly and then the Young woman wanted to drive.

He said he stopped the car, got out and seated himself on the right of the front seat, and the woman drove from that point continuously to the scene of the accident; said he was tired and drowsy; and that the first untoward happening sensed by him was the hitting of the mail-box.

His testimony in direct is as follows:

Q. "Then what happened?
A. So, she was very nervous, the first she come across me, which my window was open.
Q. Now, you were sitting down and she was sitting down?
A. Yes.
Q. Now, go careful so the jury will understand. After hitting the mail-box, now tell — did the car move?
A. Yes, the car moved, so she came across me.
Q. To your right, over your —?
A. Yes, over me. The window was open, so I tried to reach for the wheel and grab the brake.
Q. Then what happened?
A. The car tipped.
Q. Did you get a hold of the wheel or brake?
A. I got hold of the brake as good as I could.
Q. When she went across you had she lost control?
A. She must. She lost control of the car.
Q. And went across and in the ditch?
A. In the ditch.
Q. Now, what about the speed?

A. The car wasn't going over twenty miles an hour.

Q. Wasn't going over twenty miles an hour?

A. Twenty or twenty-five miles an hour."

In cross examination he said that after hitting the mail-box the car was going only about ten or twelve miles an hour. The record gives no detailed description of the appearance of the car after the accident, but Mr. Coffin describes it as "dented and banged up in general," and he stated that the gutter on the right side, that carries the water which may drip from the roof, "was shaved right off as if it had come against something hard, rocks or something."

Asked about the dead woman's hair, when describing the body, Dr. Milliken said she had brown hair which had been bobbed and was quite long, and that on the left side just sticking into the hair was a black hairpin.

Sergeant Beck found in the car, "in the seam in the roof," a mass of brown hair, on a hairpin. Officer Holmes saw it there, "right over the front door, in the edge of the top of the car."

Chief Crowley said, "right at the top, right door, of the car at exactly in the center there was a hairpin, bent and drove in, with a tuft of brown hair wrapped round it."

The respondent got out of the car through the left front door, and testified that he pulled the Pushard woman from the rear of the car into the front and out through the front door.

Except for the respondent's version the evidence is wholly circumstantial.

It must be assumed that the jury were conscious of the gravity of the indictment, and of the peril in which the respondent stood before them.

It must be that they refused to believe that Rist was not driving the car when his companion was killed.

That he was unnerved by the horrible ending of the pleasure drive was but natural. That when told that his companion was dead he said "I've killed Lena," does not prove his guilt.

But from this expression, coupled with the suggestion that he deserved, or ought, to have a rope around his neck, the jury might well assume that in fact he was driving at the end of the trip, and

that his testimony was an "explanation," and not a true recital of the incidents of the drive.

It must be concluded there is no reasonable doubt that he operated the car with the degree of recklessness or carelessness which proved him guilty of manslaughter.

This Court is not trying the case. It is for us to review the evidence, as presented in the printed record and to say whether or not we find the verdict wrong.

Suffice it to say that we do not find in the record what would justify us in setting aside the verdict.

*Appeal dismissed.*
*Judgment for the State.*